# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 16, 2010        Decided June 28, 2011
Reissued September 22, 2011

No. 09-5399

SECURITIES AND EXCHANGE COMMISSION,
APPELLEE

v.

CHARLES JOHNSON, JR.,
APPELLEE

CHRIS BENYO,
APPELLANT

MICHAEL KENNEDY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-00036)

———

*Terrance G. Reed* argued the cause for appellant. With him on the briefs was *Vernon T. Lankford.*

*Luis de la Torre*, Senior Litigation Counsel, Securities and Exchange Commission, argued the cause for appellee Securities and Exchange Commission. With him on the brief

were *David M. Becker*, General Counsel, *Jacob H. Stillman*, Solicitor, and *Rada Lynn Potts*, Attorney. *John D. Worland Jr.*, Counsel, entered an appearance.

Before: SENTELLE, *Chief Judge*, GINSBURG and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

GINSBURG, *Circuit Judge*: In this civil enforcement action, a jury found Christopher Benyo aided and abetted a securities fraud by his former employer PurchasePro.com, Inc., in violation of 15 U.S.C. § 78t(e). The district court fined Benyo $35,000 and barred him from serving as an officer or director of a publicly held company for five years. On appeal, Benyo argues the district court erred in allowing his trial to proceed in the District of Columbia pursuant to the "co-conspirator theory of venue." We reverse the judgment of the district court on the basis of improper venue and do not reach Benyo's claims relating to the merits of the case against him.

## I. Background[*]

From 2000 to 2001, Benyo served as Senior Vice President for Marketing and Network Development for PurchasePro, which made software for online "business-to-business" sales. PurchasePro sold licenses that granted the holders access to its online "marketplace" where they could

---

[*] We take the facts in Part I from the evidence at trial, the findings of the district court, *see SEC v. Johnson*, 565 F.Supp.2d 82 (D.D.C. 2008); *SEC v. Johnson*, 530 F.Supp.2d 315 (D.D.C. 2008); *see also SEC v. Johnson*, 595 F.Supp.2d 40 (D.D.C. 2009); and the undisputed findings of the district court for the Eastern District of Virginia in a related criminal case, *see United States v. Johnson*, 553 F.Supp.2d 582 (2008).

buy and sell goods and build a company-specific site using PurchasePro's technology.

Early in 2000, America Online, Inc. (AOL) engaged PurchasePro to help it build NetBusiness, an online sales platform for small businesses, and in March of that year, PurchasePro agreed to pay AOL for advertising and for referring new customers to PurchasePro. The companies entered into additional agreements later that year that made AOL a sales agent for PurchasePro. By the end of 2000, PurchasePro's business depended heavily upon the payments and referrals it received from AOL.

In September 2000, PurchasePro began to document sham transactions in order to inflate its reported revenue. Certain customers referred by AOL agreed to buy licenses to PurchasePro's software in exchange for a side agreement for AOL or PurchasePro to subsidize the purchase. Because PurchasePro would disclose the sale but not the side agreement, each transaction appeared on paper to generate a substantial amount of revenue for PurchasePro.

PurchasePro also backdated or entirely falsified new agreements with AOL. The company later attributed $3.65 million in revenue to one of those contracts — an agreement to integrate an auction platform into AOL's NetBusiness, styled as a subcontract under a pre-existing agreement between AOL and a third company, AuctioNet, Inc. In the first quarter of 2001, two-thirds of PurchasePro's announced revenues of $29.8 million in some way came from the company's dealings with AOL, whether through the sham referrals or the new fraudulent contracts.

PurchasePro's auditors and attorneys learned the AuctioNet deal was phony on May 14, 2001, when AOL sent PurchasePro's chief accounting officer a letter stating it had

no documentation of the deal. Until then the company's auditors and attorneys had relied upon a "Statement of Work" dated February 5, 2001 and apparently executed by AOL and PurchasePro, but which they had suspected was a forgery. After AOL confirmed that suspicion, PurchasePro excluded from its report to the SEC the revenue associated with the AuctioNet deal and the other fraudulent agreements it had discovered. On the Form 10-Q it filed on May 29, 2001, PurchasePro reported only $16 million of the nearly $30 million in revenue it had publicly announced the month before. PurchasePro declared bankruptcy in 2002.

In January 2005, the Government filed in the Eastern District of Virginia a 31-count indictment against Benyo, three other PurchasePro employees, and two executives of AOL. By that time, six former executives of PurchasePro had agreed to plead guilty to charges relating to the fraud and cover-up and, as part of a deferred-prosecution agreement, AOL had admitted having aided and abetted a securities fraud. *See* Dep't of Justice, *America Online Charged with Aiding and Abetting Securities Fraud*, http://www.justice.gov/opa/pr/2004/December/04_crm_790.htm (Dec. 15, 2004).

On the same day, the SEC filed this civil enforcement action against the same defendants in the District of Columbia. The SEC alleged Benyo had "worked on drafting or caused others to draft" the Statement of Work for the phony AuctioNet deal. The complaint further alleged that, in order "to create the false appearance ... the [integration] services described in the Statement of Work had actually been performed" during the first quarter of 2001, Benyo had devised a plan to place on the NetBusiness site a hyperlink to AuctioNet.com. From the alleged facts, the SEC inferred Benyo "knew or was reckless in not knowing" PurchasePro

intended to recognize and report revenue associated with the fraudulent Statement of Work; therefore he had aided and abetted the company's fraud, in violation of 15 U.S.C. § 78t(e);[*] aided and abetted the company's failure to maintain internal accounting controls, in violation of § 78m(b)(5); falsified books and records, also in violation of § 78m(b)(5) and of 17 C.F.R. § 240.13b2-1 (Rule 13b2-1); and misled an accountant or auditor, in violation of 17 C.F.R. § 240.13b2-2 (Rule 13b2-2).

The SEC's civil case against Benyo went to trial only after the jury in Virginia had acquitted Benyo of all criminal charges. The civil jury here then found Benyo liable on the one count of aiding and abetting PurchasePro's securities fraud and absolved him of the other charges. The district court fined Benyo $35,000 and barred him from serving as an officer or director of a publicly traded company for five years, as authorized by § 78u(d).

In his answer to the SEC's complaint, Benyo had argued venue was improper in the District of Columbia. He renewed that objection in a motion for summary judgment, and again after trial in a motion for judgment as a matter of law. In each filing, Benyo argued the allegations showed he had acted only in Nevada, and, more important, no "act or transaction constituting the violation[s]" with which he was charged had occurred in the District of Columbia, as required for venue under § 78aa. The SEC countered that the District was a permissible forum under the "co-conspirator venue theory" because Benyo had been "in league with a defendant who ...

---

[*] Statutory references hereinafter refer to Title 15 of the United States Code unless otherwise noted.

6

act[ed] within the [D]istrict." *Johnson*, 565 F. Supp. 2d at 92.[*]

The district court adopted the Commission's "co-conspirator theory of venue," which it said courts "routinely apply" when a complaint alleges a securities fraud "involving multiple defendants acting in multiple districts." *Id.* at 92. Here, the defendant had allegedly "aided and abetted a scheme, a material part of which occurred in the District of Columbia," to wit, PurchasePro's filing a misleading Form 10-K for 2000 and Form 10-Q for the first quarter of 2001. *Id.* at 93*; see SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1154 & n.12 (D.C. Cir. 1978) (filings with SEC occur as a matter of law in the District of Columbia). The district court rejected, however, the SEC's assertion the scheme had also reached the District of Columbia by way of a press release PurchasePro had sent out nationwide and a nationally broadcast conference call with securities analysts in which PurchasePro had made misleading or incorrect statements about the company's revenue. *Johnson*, 565 F. Supp. 2d at 91, n.11.

## II. Analysis

The parties' dispute over the proper interpretation of § 78aa, the special venue section of the Securities Exchange Act of 1934, clearly raises a question of law. Therefore we address it de novo. *See* 5B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY K. KANE, & RICHARD L. MARCUS, FEDERAL PRACTICE & PROCEDURE § 1352 (3d ed.); *see also Armstrong v. Geithner*, 608 F.3d 854, 857 (D.C. Cir. 2010).

---

[*] The SEC also argued the District was a permissible forum under the doctrine of pendent venue, but the district court did not address that argument and the SEC does not renew it on appeal.

Venue for a civil action under the securities laws lies "in the district wherein the defendant is found or is an inhabitant or transacts business," or "in the district wherein any act or transaction constituting the violation occurred." § 78aa. By the reference to "any act," the statute permits a plaintiff to bring suit in any district where any person has committed any act that "constitute[s]" the offense with which the defendant is charged.

The co-conspirator theory of venue is but a gloss upon and an extension of § 78aa. The question presented in this case is whether that extension is consistent with the terms of § 78aa. Benyo contends it is not, relying in particular upon *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994), in which the Supreme Court held there was no private right of action for aiding and abetting securities fraud and strongly implied there could be no cause of action for any form of "secondary liability" for fraud that does not require proof of each of the elements of the primary violation, *see id.* at 180, 184. After *Central Bank of Denver* was decided, the Congress enacted § 78t(e) to give the SEC express authority to pursue a person who has aided and abetted a securities fraud. *See* Private Securities Litigation Reform Act of 1995, § 104, Pub. L. 104-67, 109 Stat. 737, 757 (1995); *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158 (2008). Because § 78t(e) did not similarly authorize the SEC to sue for conspiracy to commit securities fraud, Benyo reasons, an allegation of conspiracy is not by itself — that is, without proof of his actual participation in a fraud — a sufficient basis for liability under *Central Bank of Denver* and therefore cannot be a sufficient basis for venue.

The SEC responds, "[f]irst, conspiracy liability is available to the Commission" because *Central Bank of*

*Denver* concerned an implied private right of action and therefore "did not apply to" the SEC, and, second and "[m]ore fundamentally," the scope of venue does not turn upon the scope of liability. Indeed, we are told, the co-conspirator theory of venue "is often used" by the SEC, "serves important purposes," and has been adopted by "at least" three other circuits. All the circuit court decisions in question, however, pre-date *Central Bank of Denver, see SIPC v. Vigman*, 764 F.2d 1309, 1317 (9th Cir. 1985); *Hilgeman v. Nat'l Ins. Co. of Am.*, 547 F.2d 298, 302 & n.12 (5th Cir. 1977); *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 620 (2d Cir. 1968), and hence the SEC's reliance upon them begs the question whether *Central Bank of Denver* precludes the co-conspiracy theory of venue.

We believe § 78aa by its terms forecloses use of the co-conspirator theory of venue; a suit simply may not be brought in a forum where there is no statutory basis for venue. We cannot countenance any so-called theory that "add[s] a gloss to the operative language of the statute quite different from its commonly accepted meaning." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976).

Benyo's case is paradigmatic: The SEC did not identify in the complaint or in its evidence at trial "any act or transaction" of Benyo's occurring in the District of Columbia and "constituting the violation" of § 78t(e), §78m(b)(5), Rule 13b2-1, or Rule 13b2-2 with which he was charged. Instead it argues the filing of a Form 10-Q with the SEC was an act in the District constituting "a securities fraud violation" by PurchasePro. That is not the violation attributed to Benyo, however, as § 78aa requires; the revenue item he allegedly falsified was not included in the Form 10-Q. If the only act allegedly done in this district is not linked to Benyo in any of the ways listed in § 78aa, then no "theory" can supply the

deficiency. In other words, at least one statutory basis for venue, no matter how broadly or narrowly that particular requirement might be construed, must have occurred in the chosen forum.

We note the Supreme Court has rejected the co-conspirator theory as a basis for venue in a suit under the antitrust laws, which permit a plaintiff to sue only in a district wherein the defendant "resides or is found or has an agent." 15 U.S.C. § 15. In *Bankers Life & Casualty Co. v. Holland*, the Supreme Court condemned the theory as "a frivolous albeit ingenious attempt to expand the statute," 346 U.S. 379, 384 (1953) (dictum). That, as a practical matter, was the end of the co-conspirator theory of venue in antitrust. *See, e.g. Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 494-95 (9th Cir. 1979); *San Antonio Tel. Co. v. AT&T*, 499 F.2d 349, 351 n.3 (5th Cir. 1974); *H.L. Moore Drug Exchange, Inc. v. Smith, Kline & French Labs.*, 384 F.2d 97, 98 (2d Cir. 1967); *see also In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 283-84 (4th Cir. 2007) (citing *Bankers Life* and noting antitrust plaintiffs have no "statutory right" to try all antitrust co-conspirators in the same district).

After the *Bankers Life* decision and their own antitrust cases following it, the Second, Fifth, and Ninth Circuits again approved use of the co-conspirator theory under § 78aa. The Second and the Ninth Circuits did so based expressly upon "[t]he strong policy favoring the litigation of related claims in the same forum." *Vigman*, 764 F.2d at 1318; *Wyndham Assocs.*, 398 F.2d at 617, 619 (similar); *see generally* Rhett Traband, *The Case Against Applying the Co-Conspiracy Venue Theory in Private Securities Actions*, 52 Rutgers L. Rev. 227, 246-47 (1999) ("the avoidance of duplicative litigation has been the chief policy argument invoked in favor of the [co-conspirator] Theory").

The Supreme Court has repeatedly made clear "[p]olicy considerations cannot override our interpretation of the text and structure of the [Exchange] Act." *Central Bank of Denver*, 511 U.S. at 188. Indeed, the Court has refused to consider policy arguments in the interpretation specifically of § 78aa. *See, e.g.*, *Leroy v. Great Western United Corp.*, 443 U.S. 173, 181-82 & n.14 (1979) (rejecting plaintiff State's argument for broad reading of venue under § 78aa offered to facilitate policy of Exchange Act generally favoring plaintiffs); *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 156 & n.12 (1976) (holding § 78aa did not supersede narrower venue provision in National Bank Act and rejecting amicus SEC's suggestion § 78aa should apply nonetheless to facilitate consolidation of litigation as a "policy argument[] ... more appropriately addressed to Congress"); *see also Leroy*, 443 U.S. at 184 ("The desirability of consolidating similar claims in a single proceeding ... does not justify reading [28 U.S.C. § 1391] to give the plaintiff the right to select the place of trial that best suits his convenience"); *Olberding v. Illinois Cent. R.R. Co.*, 346 U.S. 338, 340 (1953) ("The requirement of venue is specific and unambiguous; it is not one of those vague principles which, in the interest of some overriding policy, is to be given a 'liberal' construction").

Accordingly, we hold the SEC failed to lay venue in the District of Columbia under "the straightforward language of [§ 78aa]." *Leroy*, 443 U.S. at 182 n.14.

## III. Remedy

There remains the question of remedy. The SEC argues the improper venue in this case was a harmless error, not prejudicial to Benyo, and should be overlooked, whereas Benyo argues reversal is the appropriate remedy for improper venue, even after a jury trial. That was the judgment of the

Supreme Court in *Olberding v. Illinois Central*, 346 U.S. at 340 (reversing verdict for plaintiff after jury trial in a venue improper under 28 U.S.C. § 1391(a)), and despite the passage of time, *Olberding* remains the law. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 41 (1998) ("reversal with new trial is required [where] venue is precluded by the governing statute" (citing *Olberding*)); *Leroy*, 443 U.S. at 181, 184 & n.18 (citing *Olberding* and reversing declaratory judgment for improper venue).

The SEC ignores *Olberding* notwithstanding Benyo's reliance upon it. The Commission instead suggests we can affirm the judgment on the ground the error is harmless, as it says we did in *Whittier v. Emmet*, 281 F.2d 24 (D.C. Cir. 1960), where sailors' claims for life insurance benefits owed them by the Government had been erroneously consolidated in this district. We noted there in a dictum that none of the parties had been prejudiced by the error, *id.* at 30: not the plaintiffs, because they had failed to make and preserve a timely objection to venue, and not the Government, because we ruled in its favor on the merits of its appeal. Here, as we have seen, Benyo preserved his objection to venue at every opportunity and the error in venue would be "harmless" to him, in the sense in which we used that term in *Whittier*, only if we were also to rule in his favor on the merits. *Whittier* therefore cannot carry the weight the SEC would have us place upon it. *See also Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 297 (3d Cir. 1994) (describing Whittier facts as "somewhat unique" [sic] and venue question as "really only of academic interest").

The judgment below is accordingly reversed and the district court is instructed to dismiss the case without prejudice.

*So ordered.*