# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 14, 2017        Decided July 27, 2018

No. 17-7037

JAMES OWENS, ET AL.,
APPELLANTS

v.

BNP PARIBAS, S.A., ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01945)

*John Vail* argued the cause for appellants. With him on the briefs were *Thomas F. Fay* and *Jane C. Norman*.

*Jeffrey R. White* was on the brief for *amicus curiae* American Association for Justice in support of appellants.

*Lawrence B. Friedman* argued the cause for appellees. With him on the brief were *Jonathan I. Blackman* and *Alexis Collins*.

*David D. DiBari* and *Stephen M. Nickelsburg* were on the brief for *amicus curiae* Institute of International Bankers in support of appellees.

Before: GRIFFITH and WILKINS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: In 1998, al Qaeda detonated truck bombs outside the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, killing over two hundred people and injuring several thousand more. Victims of these attacks sued the French bank BNP Paribas for damages under the Anti-Terrorism Act (ATA), alleging the bank provided financial assistance to Sudan, which in turn funded and otherwise supported al Qaeda's attack. Because the victims fail to plausibly allege BNP Paribas caused their injuries, and because the ATA does not permit recovery for claims premised on aiding and abetting liability, the district court dismissed the suit for failure to state a claim. We affirm.

I

A

On August 7, 1998, truck bombs exploded outside the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania. At least twelve of the more than two hundred deaths and many of the 4,000 injured individuals were U.S. nationals. *See Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 102 (D.D.C. 2006). Osama bin Laden and al Qaeda claimed responsibility. The embassy bombings served as a prelude to subsequent al Qaeda attacks against the United States, culminating in the atrocities of September 11, 2001.

But al Qaeda didn't act alone. The Republic of Sudan and the Islamic Republic of Iran helped facilitate the embassy bombings in several ways. For its part, Sudan provided safe

harbor for al Qaeda's operational and logistical supply network, as well as critical financial, military, and intelligence services. *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 139-46 (D.D.C. 2011). In the early 1990s, Sudan invited al Qaeda to relocate from Afghanistan and promised the government's support. Am. Compl. ¶ 104. Al Qaeda accepted the invitation and moved its operations to Sudan, purchasing real estate and agreeing to supply the Sudanese government with communications equipment, weapons, and labor for making chemical weapons. *Id.* In return, the Sudanese government provided al Qaeda with airplanes to bring their missiles from Afghanistan to Sudan, security, intelligence-gathering services, travel documents, economic aid, and uranium. *Id.*

In response to Sudan's growing ties to terrorist organizations, the U.S. Secretary of State designated the country as a state sponsor of terrorism in 1993. *Id.* ¶¶ 47, 61. The Secretary noted that the Sudanese government harbored international terrorists, maintained close ties to Iran, and provided meeting locations, transit points, and safe havens for various radical extremist groups. *Id.* ¶ 61. The United States thereafter placed sanctions on Sudan, restricting U.S. foreign assistance to its government, banning defense exports and sales, and imposing various financial constraints. *Id.* ¶ 62.

By the late 1990s, the United States placed even greater restrictions on trade with Sudan. In 1997, President Clinton issued an executive order imposing a complete trade embargo that prohibited the exportation of all goods and services—including financial services—to Sudan unless the exporter received a license from the Office of Foreign Assets Control (OFAC). *Id.* ¶¶ 63-65. And in 1998, OFAC designated all of Sudan's national and major commercial banks as "Specially Designated Nationals," *id.* ¶¶ 67-68, subjecting them to even

more onerous trade restrictions and sanctions, *see* 31 C.F.R. § 515.306.

BNP Paribas, S.A. (BNPP), the largest bank in France, sought to evade U.S. sanctions on Sudan applicable to international institutions. Am. Compl. ¶¶ 30, 73. In 2014, BNPP admitted as much when it pleaded guilty in federal court to illegally conspiring with banks and other entities to evade the sanctions regime and unlawfully move nearly $9 billion through the U.S. financial system. *Id.* ¶ 73; *see also id.* ¶¶ 7-8, 95, 105-07, 109-15, 126-27; Statement of Facts, *United States v. BNP Paribas, S.A.*, No. 1:14-cr-00460 (S.D.N.Y. May 1, 2015), J.A. 90-125.

At least $6 billion of these illegally processed funds involved Sudanese banks and financial institutions. Statement of Facts ¶ 17, J.A. 95. BNPP pleaded guilty to circumventing sanctions on Sudan only from 2002 to 2007, well after the embassy bombings. Am. Compl. ¶ 76; *see also* Statement of Facts ¶ 17, J.A. 95. However, in support of its guilty plea, BNPP stipulated that by 1997 one of its subsidiaries had become the "correspondent bank" in Europe for a Sudanese government bank and all the major commercial banks in Sudan. Am. Compl. ¶ 82 (quoting Statement of Facts ¶ 19, J.A. 96-97). This meant that almost every Sudanese bank began to keep U.S. dollar accounts with BNPP. *Id.* (quoting Statement of Facts ¶ 19, J.A. 96-97). Moreover, BNPP admitted that it used various "satellite banks" outside the United States to facilitate U.S. dollar payments for Sudanese banks and evade the U.S. sanctions. *Id.* ¶¶ 87-88, 90-91 (quoting Statement of Facts ¶ 23-24, J.A. 99-100). Between 2002 and 2007, BNPP used this satellite-bank structure to process "thousands of U.S. dollar transactions, worth billions of dollars" for sanctioned Sudanese banks. *Id.* ¶ 92 (quoting Statement of Facts ¶ 24, J.A. 99-100).

5

B

The ATA creates a private cause of action for those harmed by international terrorism. Specifically, the ATA provides that "[a]ny national of the United States injured in his or her person . . . by reason of an act of international terrorism . . . may sue therefor . . . and shall recover threefold . . . damages." 18 U.S.C. § 2333(a). Therefore, on its face, the ATA has three essential elements. First, a U.S. national must have suffered an injury. Second, there must have been an act of international terrorism.[1] And third, the U.S. national's injury must have occurred "by reason of" the act of international terrorism. That is, there must be some causal connection between the act of international terrorism and the U.S. national's injury.[2]

---

[1] An activity must meet three criteria to qualify as "international terrorism." First, the activity must "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." 18 U.S.C. § 2331(1)(A) (1996). Second, the activity must appear to be intended to "intimidate or coerce a civilian population"; "influence the policy of a government by intimidation or coercion"; or "affect the conduct of a government by assassination or kidnapping." *Id.* § 2331(1)(B)(i)-(iii). Third, the activity must "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." *Id.* § 2331(1)(C).

[2] Because treble damages usually have a punitive aim, several courts have also interpreted § 2333 to require that a defendant act with some scienter above negligence, independent of any scienter required to commit the predicate act of international terrorism. *See*

Plaintiffs are U.S. nationals injured in the 1998 embassy bombings, or the estates, heirs, or survivors of U.S. nationals who died or were severely injured in the bombings. *See* Am. Compl. ¶¶ 22-26. They previously sued Sudan under the Foreign Sovereign Immunities Act, alleging that Sudan offered material support to al Qaeda's bombing of the embassies, and in 2011 received default judgments against the country. *Id.* ¶¶ 24, 27.

Several months after BNPP's 2014 federal plea, Plaintiffs filed their present complaint in district court.[3] Based on BNPP's stipulations in its guilty plea, Plaintiffs allege the bank provided material support to al Qaeda by processing financial transactions for Sudanese banks, converting Sudanese resources into U.S. banknotes, and circumventing U.S. sanctions on Sudan. *Id.* ¶¶ 6-8. Those Sudanese banks then sent that U.S. currency to al Qaeda, which used the funds to commit the embassy bombings. *See id.* ¶ 118.

On appeal, Plaintiffs claim BNPP's role in processing financial transactions for Sudanese banks violated two federal laws prohibiting the provision of material aid and support to

---

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 692-93 (7th Cir. 2008) (en banc); *see also Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 515 (S.D.N.Y. 2014); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 503 (E.D.N.Y. 2012); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 42 (D.D.C. 2010). Whether this is right has no bearing on this appeal.

[3] Plaintiffs also sued two of BNPP's wholly owned subsidiaries, BNP North America, Inc. and BNP Paribas (Suisse) S.A. *See* Am. Compl. ¶¶ 2, 29-40. We refer to these entities collectively as "BNPP."

terrorists and terrorist groups, *see id.* ¶¶ 116-20,[4] both of which may constitute acts of international terrorism under the ATA, *see, e.g.*, *Linde v. Arab Bank, PLC*, 882 F.3d 314, 325-26 (2d Cir. 2018); *Boim v. Quranic Literacy Inst.* ("*Boim I*"), 291 F.3d 1000, 1015 (7th Cir. 2002), *overruled sub nom. Boim v. Holy Land Found. for Relief & Dev.* ("*Boim III*"), 549 F.3d 685 (7th Cir. 2008) (en banc).[5] First, Plaintiffs claim BNPP "provide[d] material support or resources [to terrorists] . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" certain enumerated criminal laws. 18 U.S.C. § 2339A(a). Second, Plaintiffs claim BNPP "knowingly provide[d] material support or resources to a foreign terrorist organization." *Id.* § 2339B(a)(1).[6]

---

[4] Plaintiffs initially pled a violation of a third statute, 18 U.S.C. § 2339C, which criminalizes providing or collecting funds with knowledge that such funds would be used to carry out acts intending to cause death or serious bodily injury in order to intimidate a population or government. *See* Am. Compl. ¶¶ 116, 121-29. The district court dismissed this claim because § 2339C was enacted in 2002, post-dates the conduct at issue in this case, and does not apply retroactively. *See Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85, 98 (D.D.C. 2017). Plaintiffs do not appeal this aspect of the district court's decision and we therefore do not address the § 2339C claim.

[5] The district court held that Plaintiffs failed to plausibly allege that BNPP had sufficient knowledge of the Sudanese banks' ultimate investments to satisfy the scienter requirements of either 18 U.S.C. § 2339A or § 2339B. *See Owens*, 235 F. Supp. 3d at 98-99. Because we ultimately resolve the issue of primary liability on grounds of causation, we do not decide whether BNPP actually violated either § 2339A or § 2339B. Nor do we decide whether BNPP's violation of either of those provisions would have qualified as an act of "international terrorism" under the ATA.

[6] Because BNPP's alleged conduct took place in 1997-98, the 1996 versions of §§ 2339A and 2339B apply to this case. *See* 18 U.S.C. §§ 2339A(a), 2339B(a)(1) (1996).

Plaintiffs allege that they were injured "by reason of" BNPP's material aid and support to al Qaeda in violation of §§ 2339A and 2339B. In the alternative, Plaintiffs allege that BNPP's conduct "constituted aiding and abetting" al Qaeda's acts of international terrorism under the ATA. Am. Compl. ¶ 130.[7]

---

[7] As the district court observed, "Plaintiffs' complaint is not a model of clarity." *Owens*, 235 F. Supp. 3d at 91 n.5. In particular, it is unclear whether the complaint alleges only that BNPP is liable as a primary violator of § 2333 or if it also alleges BNPP is liable as an aider and abettor of an ATA violation. While Plaintiffs use the language of aiding and abetting liability, they never actually list a claim for relief premised on civil aiding and abetting under § 2333. Nevertheless, because the parties spent much of their briefing debating the availability of aiding and abetting liability under § 2333, the district court assumed that Plaintiffs asserted those claims. *Id.* Plaintiffs continue to press for aiding and abetting liability. We follow the district court and construe Plaintiffs' complaint to include the claim.

Additionally, Plaintiffs pepper their complaint with allegations that BNPP "conspired" with Sudan to provide financial services to al Qaeda. *See, e.g.*, Am. Compl. ¶¶ 7, 8, 107, 110-11, 126. On appeal, Plaintiffs continue to claim briefly that BNPP is liable pursuant to principles of civil conspiracy. If civil conspiracy were available, BNPP would be liable if (1) BNPP entered into an "agreement" with Sudan and al Qaeda; (2) BNPP participated in an "unlawful act, or a lawful act in an unlawful manner"; (3) Plaintiffs' injuries were caused by an "unlawful overt act performed by one of the parties to the agreement"; and (4) the "overt act was done pursuant to and in furtherance of the common scheme." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). However, as we discuss below, just as Plaintiffs cannot pursue a theory of recovery based on aiding and abetting liability under § 2333, they also cannot pursue one based on conspiracy liability. *See infra* note 12.

After Plaintiffs filed their complaint, BNPP moved to dismiss the suit, arguing that the complaint failed to state a claim for which relief may be granted under the ATA. The district court granted BNPP's motion. *See Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85, 100 (D.D.C. 2017). Plaintiffs timely appealed.

## II

The district court had jurisdiction under the ATA. *See* 18 U.S.C. § 2333(a) (granting any ATA claimant the right to sue "in any appropriate district court of the United States"). We have appellate jurisdiction under 28 U.S.C. § 1291.

We review de novo the district court's order granting BNPP's motion to dismiss. *See Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017).

## III

We first address whether Plaintiffs sufficiently allege that BNPP is directly liable under the ATA. Recall that any ATA claim requires that a U.S. national be injured "by reason of" an act of international terrorism. Plaintiffs are all U.S. nationals and we assume here that BNPP's conduct violated the material-support statutes and therefore constituted an act of international terrorism. We focus only on whether Plaintiffs have sufficiently alleged that they were injured "by reason of" BNPP's actions.

## A

Our analysis of a motion to dismiss for failure to state a claim follows a familiar process. "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). A complaint can establish a facially plausible claim only if it sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In determining a complaint's plausibility, we accept as true all of the complaint's factual allegations and draw all reasonable inferences in favor of the plaintiffs. *See City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009); *see also Atherton*, 567 F.3d at 677. However, we "need not accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations." *City of Harper Woods*, 589 F.3d at 1298. "Nor must we accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004). Public records are subject to judicial notice on a motion to dismiss when referred to in the complaint and integral to the plaintiff's claim. *Id.* at 965.

B

The district court held and Plaintiffs do not dispute that the ATA's "by reason of" language demands a showing of proximate causation. *See Owens*, 235 F. Supp. 3d at 95-97; Plaintiffs Br. 20; Reply Br. 7. To survive a motion to dismiss for failure to state a claim, Plaintiffs must therefore plausibly allege (1) that BNPP's acts were "a 'substantial factor' in the sequence of events" that led to their injuries and (2) that those injuries "must have been 'reasonably foreseeable or anticipated as a natural consequence' of" BNPP's conduct. *Owens v.*

*Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017) (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)).[8] The only dispute is whether the factual allegations set forth in Plaintiffs' complaint meet this standard.

Plaintiffs contend BNPP's knowing manipulation of currency on behalf of Sudanese banks was a proximate cause of the injuries they suffered in the embassy bombings. Meanwhile, BNPP argues that the ATA's "by reason of" proximate causation requirement cannot be satisfied when a defendant is alleged only to have transferred funds to a state sponsor of terrorism that later supports a terrorist act.

---

[8] After briefing and oral argument in this appeal, the Ninth Circuit issued a decision interpreting the ATA's "by reason of" language. *See Fields v. Twitter, Inc.*, 881 F.3d 739, 744-49 (9th Cir. 2018). The Ninth Circuit held that to establish proximate causation under the ATA's "by reason of" standard there must be "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 745 (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)); *see also id.* at 749 ("A plaintiff must show at least some direct relationship between the injuries that he or she suffered and the defendant's acts to bring a successful ATA claim."). The Ninth Circuit suggested that this direct-relation requirement might represent a "higher" standard for proximate causation than the two-prong formulation we adopted from *Rothstein* in *Owens*. *See id.* at 744. We are not so sure. As we read *Rothstein*, the Second Circuit's discussion of proximate causation implies that requiring an act to be "a substantial factor in the sequence of responsible causation" likewise requires sufficient directness. *See Rothstein*, 708 F.3d at 91-92. Even the Ninth Circuit refers to *Rothstein*'s decision to equate the substantial-factor requirement with a direct-relation requirement. *See Fields*, 881 F.3d at 747 (discussing *Rothstein*'s quotation of *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006), in which the Supreme Court stated that "the central question" for proximate causation is "whether the alleged violation led directly to the plaintiff's injuries").

We must first determine which factual allegations in Plaintiffs' complaint speak to BNPP's conduct prior to the 1998 bombings. We must likewise determine whether Plaintiffs' inferences from those facts are reasonable, such that they plausibly state a claim for relief. That is, we must ultimately decide whether the factual allegations and reasonable inferences from Plaintiffs' complaint plausibly allege that BNPP proximately caused the embassy bombings.

Regarding BNPP's conduct, Plaintiffs' complaint relies almost entirely on the statement of facts that BNPP filed in district court when it pleaded guilty in 2014 to violating various U.S. sanctions.[9] From these stipulated facts, Plaintiffs allege that BNPP "move[d] large amounts of money throughout the U.S. financial system on behalf of" Sudan and al Qaeda "between 1997 up to and including August 7, 1998," the date of the embassy bombings. Am. Compl. ¶ 111; *see also id.* ¶ 86 (alleging that "starting from at least 1997" BNPP "became key to allowing Sudan to sell oil through the United States banking system, thereby allowing Sudan to raise money to buy arms and supplies for" al Qaeda); *id.* ¶ 127 (alleging that beginning in 1997 BNPP provided "substantial banking services to Sudanese banks and financial institutions controlled by Sudan including moving billions of dollars through the United States financial market").

---

[9] The complaint also briefly incorporates a stipulation by BNPP in a consent order filed in the New York courts. *See* Am. Compl. ¶ 88 (quoting New York State Department of Financial Services Consent Order: In re BNP Paribas, S.A. at 6-7 (June 30, 2014), J.A. 132-33). However, the factual allegation drawn from the consent order is virtually identical to one made in BNPP's stipulated statement of facts. *See id.* ¶ 90 (quoting Statement of Facts ¶ 23, J.A. 99).

Most of the facts to which BNPP stipulated in federal court involved conduct after the embassy bombings, which have no bearing on what actions "caused" the bombings. In fact, only two stipulated facts repeated in the complaint occurred before the embassy bombings. First, BNPP agreed to become the sole "correspondent bank" in Europe for the Sudanese government, meaning nearly all major Sudanese banks would have U.S. dollar accounts with BNPP. *Id.* ¶ 82 (quoting Statement of Facts ¶ 19, J.A. 96). Second, to disguise the true nature of BNPP's later transactions with Sudanese banks and to evade U.S. sanctions, BNPP established relationships with international "satellite banks." *Id.* ¶ 90 (quoting Statement of Facts ¶ 23, J.A. 99). Neither of these allegations speaks to whether BNPP began moving Sudanese resources through the U.S. financial system prior to the embassy bombings.

In alleging that transactions between BNPP and Sudan began in 1997, Plaintiffs also rely on a blatant misinterpretation of BNPP's stipulations. Plaintiffs allege that BNPP admitted that "in the months and years" following a 1997 decision to use an unaffiliated bank in the United States (captioned in the statement of facts as "U.S. Bank 1") as its "principal means for clearing U.S. dollar transactions" with sanctioned Sudanese banks, its personnel were aware that BNPP was circumventing U.S. sanctions. *Id.* ¶ 84; *see also id.* ¶ 85 (quoting Statement of Facts ¶ 31, J.A. 103). But Plaintiffs misrepresent the timeline established by BNPP's stipulations. The decision to use U.S. Bank 1 did not occur in 1997, as Plaintiffs claim. Rather, BNPP admitted that it decided to use U.S. Bank 1 at a meeting that took place shortly after BNPP entered into a Memorandum of Understanding with federal and state authorities regarding BNPP's failure to comply with a federal anti-money-laundering statute. *See* Statement of Facts ¶ 29, J.A. 102. BNPP entered into that agreement in September 2004. *Id.* ¶ 28, J.A. 101-02. Establishing that BNPP processed U.S. dollars for

Sudan "in the months and years" after a decision made in 2004 does nothing to support the existence of banking transactions between BNPP and Sudan *before* the 1998 embassy bombing.[10] At bottom, Plaintiffs do not allege facts addressing directly whether BNPP began to process funds for Sudan before the embassy bombings.

That said, Plaintiffs' failure to allege transactions between BNPP and Sudan before the bombings does not end our inquiry. We must also grant Plaintiffs "the benefit of all reasonable inferences derived from the facts alleged," *Bregman v. Perles*, 747 F.3d 873, 875 (D.C. Cir. 2014), and will therefore consider whether we can reasonably infer the existence of transactions between BNPP and Sudan from the well-pleaded facts that Plaintiffs do allege. We can. Plaintiffs offer factual allegations establishing a general banking relationship between BNPP and Sudan as early as 1997. *See* Am. Compl. ¶ 82. Plaintiffs also plead facts showing that before the bombings BNPP developed relationships with "satellite banks" to "help disguise the true nature of transactions with sanctioned Sudanese banks." *Id.* ¶ 90 (quoting Statement of Facts ¶ 23, J.A. 99). Given these accepted facts, we think it reasonable to infer that the banking relationship between BNPP and Sudan that developed before the bombings involved some form of financial services, including BNPP's processing of funds for Sudan.

---

[10] Moreover, in a portion of the stipulated statement of facts that Plaintiffs neglected to cite in their complaint, BNPP even indicated that it only began processing funds for Sudan in 2000, long after the embassy bombings. *See* Statement of Facts ¶ 19, J.A. 96 ("In addition to processing U.S. dollar transactions, in 2000, BNPP . . . also developed a business in letters of credit for the Sudanese banks.").

"But even if the complaint's well-pleaded facts" of a banking relationship "give rise to a plausible inference" that BNPP processed funds for Sudan before the bombings, "that inference alone would not entitle [Plaintiffs] to relief." *Iqbal*, 556 U.S. at 682. To establish a plausible claim for relief under the ATA, Plaintiffs must plausibly allege proximate causation. *See Owens*, 864 F.3d at 794. Among other requirements that we need not address here, Plaintiffs must plausibly allege that any inferred transactions between BNPP and Sudan were "a 'substantial factor' in the sequence of events that led to [Plaintiffs'] injur[ies]." *Id.* (quoting *Rothstein*, 708 F.3d at 91).[11]

In addressing whether BNPP's alleged conduct was a "substantial factor" in producing Plaintiffs' injuries, we are guided by *Rothstein*, in which the Second Circuit confronted a remarkably similar set of facts. The Second Circuit held that another bank, UBS, could not be liable under the ATA for merely converting funds into U.S. currency for Iran, another state sponsor of terrorism. The plaintiffs there failed to plead non-conclusory allegations of a "proximate causal relationship between the cash transferred by UBS to Iran and the terrorist attacks by H[e]zbollah and Hamas that injured plaintiffs." *Rothstein*, 708 F.3d at 97. The *Rothstein* plaintiffs had made only general allegations that because Iran was a state sponsor of terrorism, UBS knew the cash dollars it had processed for Iran would be used by Hezbollah or Hamas. *Id.* But because Iran "is a government, and as such it has many legitimate

---

[11] Proximate causation also requires that Plaintiffs' injuries were "reasonably foreseeable or anticipated as a natural consequence" of BNPP's conduct. *Owens*, 864 F.3d at 794 (quoting *Rothstein*, 708 F.3d at 91). Because we conclude that Plaintiffs' complaint fails on "substantial factor" grounds, we need not address reasonable foreseeability.

agencies, operations, and programs to fund," the plaintiffs had failed to adequately plead "that the moneys UBS transferred to Iran were in fact sent to H[e]zbollah or Hamas or that Iran would have been unable to fund the attacks by H[e]zbollah and Hamas without the cash provided by UBS." *Id.*

*Rothstein* correctly recognized that when a defendant is more than one step removed from a terrorist act or organization, plaintiffs suing under the ATA must allege some facts demonstrating a substantial connection between the defendant and terrorism. In *Rothstein*, the presence of an independent intermediary, Iran, created a more attenuated chain of causation connecting UBS to Hezbollah and Hamas than one in which a supporter of terrorism provides funds directly to a terrorist organization. *See, e.g.*, *Boim III*, 549 F.3d at 698 (holding that donors to Hamas could proximately cause a Hamas victim's death as "knowing contributors [who] would have significantly enhanced the risk of terrorist acts and thus the probability that the plaintiff's decedent would be a victim").

Furthermore, when an intermediary is a sovereign state with "many legitimate agencies, operations, and programs to fund," the need for additional allegations supporting substantiality is all the more acute. *Rothstein*, 708 F.3d at 97. That an intermediating country is a state sponsor of terrorism does not reduce the need for evidence of a substantial connection between the defendant and a terrorist act or organization. If Congress intended that "any provider of U.S. currency to a state sponsor of terrorism would be strictly liable for injuries subsequently caused by a terrorist organization associated with that state," it would have done so explicitly. *Id.* at 96. For example, Congress found that money earmarked for peaceful activities donated directly to a terrorist organization nevertheless furthers the organization's violent ends enough to justify a prohibition on *all* financial support for such an

organization. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 29 (2010). But Congress made no similar findings with regard to state sponsors of terrorism. *See, e.g.*, *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 642 (S.D. Tex. 2011); *Rothstein v. UBS AG*, 772 F. Supp. 2d 511, 516 (S.D.N.Y. 2011). In fact, Congress affirmatively chose to *permit* financial transactions with state sponsors of terrorism, so long as the prospective funder obtains a license from the Department of State. *See* 50 U.S.C. § 4605(j). Reading § 2333 to permit strict civil liability for all such transactions with state sponsors of terrorism would be inconsistent with Congress's regulatory scheme.

In sum, in order to satisfy proximate causation under the ATA, Plaintiffs' complaint needs to adequately plead facts alleging that BNPP *substantially* contributed to Plaintiffs' injuries because the funds to Sudan "actually [were] transferred to al Qaeda . . . and aided in" the embassy bombings. *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013). The complaint alleges that the Sudanese banks transmitted the funds from BNPP directly to al Qaeda, *see* Am. Compl. ¶¶ 8, 16, 110, and that these funds from BNPP were necessary for al Qaeda to carry out the embassy bombings, *see id.* ¶¶ 12-13, 16, 107. But as in *Rothstein*, "these are conclusory allegations that do not meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by [BNPP] to [Sudan] and the terrorist attacks by [al Qaeda] that injured plaintiffs." *Rothstein*, 708 F.3d at 97. All told, "[w]e see no nonconclusory allegation in the Complaint that plausibly shows that the moneys [BNPP] transferred to [Sudan] were in fact sent to [al Qaeda] or that [Sudan] would have been unable to fund the attacks by [al Qaeda] without the cash provided by [BNPP]." *Id.*

Plaintiffs' complaint fails to plausibly allege that any currency processed by BNPP for Sudan was either in fact sent to al Qaeda or necessary for Sudan to fund the embassy bombings. As such, Plaintiffs fail to adequately allege that they were injured "by reason of" BNPP's acts and cannot state a claim for relief based on a theory of primary liability under the ATA.

IV

We next address whether Plaintiffs can bring a claim of aiding and abetting under the ATA. If aiding and abetting liability were available under the ATA, BNPP would not need to satisfy any of the ATA's elements to be held liable for Plaintiffs' injuries. Instead, BNPP would be liable for al Qaeda's acts of international terrorism, so long as BNPP "knowingly and substantially assist[ed] the principal violation" of the ATA by al Qaeda and was "generally aware" of its role as part of al Qaeda's illegal activities when providing that assistance. *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *see also* Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, § 2(a)(5), 130 Stat. 852, 852 (2016) (describing *Halberstam* as the "leading case regarding Federal civil aiding and abetting and conspiracy liability").

Before 2016, the ATA made no explicit reference to aiding and abetting liability. Then, in 2016, Congress enacted JASTA to "provide civil litigants with the broadest possible basis . . . to seek relief against [those] that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, § 2(b), 130 Stat. at 853. Specifically, Congress maintained that it was "necessary to recognize the substantive causes of action for aiding and abetting and conspiracy liability under" the ATA. *Id.* § 2(a)(4), 130 Stat. at 852. JASTA

therefore amended § 2333 to expressly state that "liability [under the ATA] may be asserted as to any person who aids and abets, by knowingly providing substantial assistance" to an act of international terrorism or "who conspires with" any person committing such an act. *Id.* § 4(a), 130 Stat. at 854 (codified at 18 U.S.C. § 2333(d)(2)).

However, this amended version of § 2333 is inapplicable to Plaintiffs' present suit. JASTA's provision for aiding and abetting liability only applies to injuries arising "on or after September 11, 2001." JASTA § 7(2), 130 Stat. at 855. Because Plaintiffs were injured in bombings that took place before this effective date, they must instead rely on the pre-JASTA version of § 2333.

In answering whether the pre-JASTA version of § 2333 incorporated aiding and abetting liability, we are guided by the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). *Central Bank* concerned § 10(b) of the Securities Exchange Act of 1934, a provision that renders unlawful various manipulative or deceptive acts made in connection with the purchase or sale of securities. In the 1970s, the Supreme Court found an implied private right of action in § 10(b). *See Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971). Then, in *Central Bank* the Court held that private civil liability under § 10(b) did not extend to those who only aided and abetted a manipulative or deceptive practice. The Court's reasoning was simple: "If . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not." *Central Bank*, 511 U.S. at 177. Because "Congress knew how to impose aiding and abetting liability when it chose to do so," and "[b]ecause the text of § 10(b) does not prohibit aiding and

abetting," courts "cannot amend the statute to create [that] liability." *Id.* at 176, 177, 191.

The key takeaway from *Central Bank* is that when Congress creates a private cause of action, aiding and abetting liability is not included in that cause of action unless Congress speaks to it explicitly. This presumption against the inclusion of aiding and abetting liability rests partially on the fact that "Congress has not enacted a general *civil* aiding and abetting statute," *id.* at 182 (emphasis added), akin to the general *criminal* aiding and abetting statute, *see* 18 U.S.C. § 2(a). Therefore, when Congress enacts a statute providing for private civil liability "there is no general presumption that the plaintiff may also sue aiders and abettors." *Central Bank*, 511 U.S. at 182. In the end, "it is not plausible to interpret the statutory silence as tantamount to an implicit congressional intent to impose . . . aiding and abetting liability." *Id.* at 185.

So too with the ATA. As the Second and Seventh Circuits correctly concluded, § 2333 does not allow for aiding and abetting liability because that provision is "silent as to the permissibility of aiding and abetting liability." *Rothstein*, 708 F.3d at 97; *see also Boim III*, 549 F.3d at 689. Moreover, other provisions in the ATA, such as § 2339A or § 2339B, clearly create criminal liability for conduct that strongly resembles aiding and abetting. *See Boim III*, 549 F.3d at 691-92. Therefore, it is doubtful "that Congress, having included in the ATA several express provisions with respect to aiding and abetting in connection with the criminal provisions, can have intended § 2333 to authorize civil liability for aiding and abetting through its silence." *Rothstein*, 708 F.3d at 98; *see also Central Bank*, 511 U.S. at 184 ("The fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere.").

Plaintiffs maintain that Congress's 2016 passage of JASTA confirms that § 2333 incorporated aiding and abetting liability all along. We disagree. We generally presume that congressional amendments make substantive changes to existing law. *See Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) ("When Congress amends legislation, courts must 'presume it intends [the change] to have real and substantial effect.'" (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995))). We cannot "instead act[] as though the amendment . . . had not taken place." *Id.* That said, sometimes when Congress "adopts a new clarifying law or rule, it does not necessarily follow that an earlier version did not have the same meaning." *Baptist Mem'l Hosp.-Golden Triangle v. Sebelius*, 566 F.3d 226, 229 (D.C. Cir. 2009).

JASTA does not indicate that Congress merely "clarified" existing law when it amended § 2333. In fact, Congress itself stated that its amendment in JASTA was "*necessary* to recognize the substantive causes of action for aiding and abetting and conspiracy liability under" the ATA. JASTA § 2(a)(4), 130 Stat. at 852 (emphasis added). If anything, JASTA's passage confirms that Congress knows how to provide for aiding and abetting liability explicitly and that the version of § 2333 in effect at the time of the embassy bombings did not provide for that liability. At the very least, nothing in JASTA shows with sufficient clarity that its amendment in § 4(a) merely clarified § 2333's preexisting meaning.

Although *Central Bank* seems to resolve with ease the availability of aiding and abetting liability, several courts in older decisions have disregarded *Central Bank*'s applicability to the ATA. For example, some courts have distinguished *Central Bank* because it involved an *implied* cause of action in the Securities Exchange Act of 1934, while the ATA provides

an *express* cause of action. *See Boim I*, 291 F.3d at 1019; *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 55 (D.D.C. 2010); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 583 (E.D.N.Y. 2005).

But nothing in *Central Bank*'s analysis turned on the implied character of § 10(b)'s cause of action, and the Court's reasoning applies to express causes of action as well. The Court found that because Congress did not attach aiding and abetting liability to express causes of action in other securities laws, "Congress likely would not have attached aiding and abetting liability to § 10(b) if it provided a private § 10(b) cause of action." *Central Bank*, 511 U.S. at 179. But why did the Court conclude that Congress had not attached aiding and abetting liability to the securities laws' express causes of action in the first place? Simple: The express causes of action were just as silent as to aiding and abetting liability as § 10(b)'s implied cause of action. In other words, the Court reasoned *as a general matter* that a statute provides for aiding and abetting liability only if expressly set out by Congress. Therefore, *Central Bank* relied on a principle of statutory interpretation that applies equally with respect to implied and express causes of action.

Courts have also sometimes premised aiding and abetting liability under the ATA on legislative history that purportedly expresses Congress's "intent to cut off the flow of money to terrorists at every point along the causal chain of violence." *Boim I*, 291 F.3d at 1021 (citing S. Rep. No. 102-342, at 22 (1992)). Apparently, refusing to impose liability on aiders and abettors of terrorism would thwart that intent and conflict with congressional understandings that the ATA "empowers victims [of terrorism] with all the weapons available in civil litigation," and "accords victims of terrorism the remedies of American tort law," 137 Cong. Rec. S4,511 (daily ed. Apr. 16, 1991)

(statement of Sen. Grassley), including aiding and abetting liability, *see Wultz*, 755 F. Supp. 2d at 56.

But these arguments overstate the role of legislative history in statutory interpretation. Some think it is appropriate to consult legislative history as "a way to understand the text" of a statute, while others go further and tout legislative history as a "more authentic . . . expression of legislators' will" than the statute's text. *In re Sinclair*, 870 F.2d 1340, 1342-43 (7th Cir. 1989). The former of these two uses is perhaps acceptable but the latter is certainly not. While legislative history may help discern the meaning of an otherwise ambiguous text, *see Milner v. Dep't of the Navy*, 562 U.S. 562, 572 (2011), it "may not be used show an 'intent' at variance with the meaning of the text," *Sinclair*, 870 F.2d at 1344. Nor is any reference to legislative history necessary "when the meaning of a statute is clear enough on its face." *Owens*, 864 F.3d at 777.

Section 2333 is not ambiguous, so no appeal to legislative history is necessary or helpful here. As *Central Bank* teaches, "the statutory text controls the definition of conduct covered by" § 2333, and when the statutory text is silent there simply is no "congressional intent to impose . . . aiding and abetting liability." 511 U.S. at 175, 185. In other words, when Congress is silent as to aiding and abetting liability, it has unambiguously foreclosed that theory of recovery. Given that § 2333 is silent with respect to aiding and abetting liability, Plaintiffs' appeals to the ATA's legislative history do not attempt to clarify the meaning of any words that appear in § 2333. Instead, the proffered legislative history is used to *supplement* the ATA's text and effectively "amend the statute to create liability" for aiding and abetting terrorism. *Id.* at 177. This *Central Bank* does not permit.

24

*Central Bank*'s reasoning is inescapable: Because the ATA does not expressly provide for aiding and abetting liability, such liability is unavailable.[12] Therefore, the ATA does not allow for any of Plaintiffs' claims against BNPP premised on aiding and abetting liability, and the district court rightly dismissed them.

V

We affirm the district court's judgment.

*So ordered.*

---

[12] The Court's reasoning in *Central Bank* also forecloses Plaintiffs' appeal to civil conspiracy liability, given the absence of an explicit congressional statement addressing it. *See Central Bank*, 511 U.S. at 200 n.12 (Stevens, J., dissenting) (stating that "[t]he Court's rationale would sweep away the decisions recognizing that a defendant may be found liable in a private action for *conspiring* to violate § 10(b)"); *accord Kramer v. Perez*, 595 F.3d 825, 830 (8th Cir. 2010); *Regents of the Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 392 (5th Cir. 2007); *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 841 (2d Cir. 1998); *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 592 (9th Cir. 1995); *cf. SEC v. Johnson*, 650 F.3d 710, 714-15 (D.C. Cir. 2011) (indicating that *Central Bank* precludes a co-conspirator theory of venue because there would be "no statutory basis for venue").